**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WILLIAM MCCRACKEN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-03-5726 |
| | § | |
| EXXON MOBIL CORPORATION | § | |
| INC., and KELLY SERVICES, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

This employment dispute arises out of William McCracken's work as a contract employee at an Exxon Mobil Corporation, Inc. plant.  McCracken sued the premises owner, Exxon Mobil Corporation, and the contractor, Kelly Services, under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, alleging that they fired him from his job as a lab technician working at the Baytown Olefins Plant laboratory because of discrimination on the basis of his religion — Christian — and in retaliation for his complaints of religious discrimination. In a previous Memorandum and Order, this court granted Exxon Mobil's motion for summary judgment.  (Docket Entry No. 30).  McCracken has filed a motion for reconsideration, (Docket Entry No. 32), and a motion for leave to file supplemental materials, (Docket Entry No. 33).  Exxon Mobil has responded, (Docket Entry No. 37), and McCracken replied, (Docket Entry No. 39).  Kelly Services has filed a motion for leave to file a motion for summary judgment and a motion for summary judgment, (Docket Entry Nos. 34, 38), to

which McCracken responded, (Docket Entry Nos. 35, 42).  Kelly Services has replied, (Docket Entry No. 43), and McCracken has surreplied and filed an additional letter brief, (Docket Entry Nos. 44, 45).

Based on a careful review of the record, the motions and responses, and the applicable law, this court grants McCracken's motion to supplement the record; grants his motion for reconsideration and withdraws its previous Memorandum and Order; grants Kelly Service's motion for leave to file a motion for summary judgment,[1] and grants in part and denies in part both Exxon Mobil's and Kelly Service's motions for summary judgment.  The reasons are explained below.

## I.      The Applicable Legal Standards

Under Title VII, it is unlawful for any employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  "A plaintiff who can offer sufficient direct evidence of intentional discrimination should prevail, just as in any other civil case where a plaintiff meets his burden."  *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 40 (5th Cir. 1996).  "However, because direct evidence of discrimination is rare, the Supreme Court has devised an evidentiary procedure that allocates

---

[1]  At this court's last status conference, this court heard arguments from the parties about this motion and ruled that Kelly Services could file a motion for summary judgment.  (Docket Entry No. 36).

the burden of production and establishes an orderly presentation of proof in discrimination cases." *Id.*; *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 957 (5th Cir. 1993).

To overcome a motion for summary judgment on Title VII discrimination claims, a plaintiff must first make a *prima facie* showing of discrimination. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–03 (1973); *Hall v. Gillman Inc.*, 81 F.3d 35, 37 (5th Cir. 1996); *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996); *Bodenheimer,* 5 F.3d at 957 n.4.  In a religious discrimination case, a *prima facie* case may be established by a showing that the plaintiff was a member of an identifiable religion; that he was qualified for the job or the benefits at issue; that he suffered an adverse employment decision; and that the adverse employment decision was differentially applied to plaintiff." *Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 399 (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *Ward v. Bechtel Corp.*, 102 F.3d 199, 202 (5th Cir. 1997)).

If, as here, a defendant's proffered reason for firing an employee is violation of a workplace policy or rule, the employee "may establish a *prima facie* case by showing 'either that he did not violate the rule or that, if he did, [employees outside the protected class] engaged in similar acts were not punished similarly." *Mayberry*, 55 F.3d at 1090 (quoting *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir. 1980)).  To establish a *prima facie* case of discriminatory discipline, the plaintiff must show that the employees outside the class "were treated differently under circumstances 'nearly identical' to his." *Id.* (citing *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991); *Smith v. Wal-Mart Stores*, 891 F.2d

1177, 1180 (5th Cir. 1990); *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570–71 (5th Cir. Unit B 1982)).

Under Title VII, a *prima facie* case of unlawful retaliation includes that: (1) the employee engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse employment action. *See Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002) (citing *Evans v. City of Houston*, 246 F.3d 344, 352 (5th Cir. 2001)); *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996). The causal link required by the third prong of the *prima facie* case does not rise to the level of a "but for" standard. *Raggs*, 278 F.3d at 471. "The plaintiff 'need not prove that her protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link' element of a *prima facie* case.'" *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002) (quoting *Long*, 88 F.3d at 305 n.4 (additional citations omitted)). If the plaintiff presents evidence supporting the *prima facie* case with evidence that the reasons given by the employer for the adverse employment action were pretextual, a jury may infer the existence of retaliation.

In assessing both discrimination and retaliation claims, establishment of a *prima facie* case creates a presumption that the employer unlawfully discriminated against the plaintiff. *Id.*; *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999). The employer must then respond with a legitimate, nondiscriminatory reason for the challenged employment decision. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000); *Bauer*, 169 F.3d at 966. "This burden on the employer is one only of production, not persuasion, involving no

credibility assessments." *Russell*, 235 F.3d at 219; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)) ("The defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, 'if believed by the trier of fact,' would support a finding that unlawful discrimination was not the cause of the employment action."). If the defendant meets its burden, the presumption of discrimination created by the *prima facie* case disappears, and the plaintiff is left with the ultimate burden of proving discrimination. *Hicks*, 509 U.S. at 511–12. The defendant bears the burden of producing evidence that its employment decision was based on a legitimate, nondiscriminatory reason. The burden then shifts back to the plaintiff to show that the defendant's proffered reason was a pretext for discrimination. If the defendant has proffered a legitimate nondiscriminatory reason for its action, the presumption of discrimination derived from the plaintiff's *prima facie* case simply 'drops out of the picture.'" *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1089–90 (5th Cir. 1995) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (additional citations omitted)).

The plaintiff may meet the ultimate burden with evidence tending to show that the reason offered by the defendant is a pretext for discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 804. Evidence demonstrating the falsity of the defendant's explanation, taken together with the *prima facie* case, is likely to support an inference of discrimination even without further evidence of the defendant's true motive. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–48 (2000). The plaintiff can survive summary judgment by producing evidence that creates a jury issue as to the employer's discriminatory animus or

the falsity of the employer's legitimate nondiscriminatory explanation. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896–97 (5th Cir. 2003); *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001).  If the plaintiff fails to produce substantial evidence of pretext, or produces evidence permitting only an indisputably tenuous inference of pretext, summary judgment in favor of the defendant is appropriate.  *See West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 385 (5th Cir. 2003); *Sandstad*, 309 F.3d at 894.

A plaintiff may also use a "mixed-motive" theory to create a genuine issue of fact material to whether the employer's legitimate, nondiscriminatory reason for the adverse employment action was a pretext for discrimination. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101–02 (2003); *Rachid v. Jack in the Box*, 376 F.3d 305, 312 (5th Cir. 2004); *McCarthy v. Primedia Workplace Learning, L.P.*, Civ.A 304CV760M, 2005 WL 3428191, *4 n.2 (N.D. Tex. Dec. 6, 2005) ("Many district courts in the Fifth Circuit have applied *Rachid*'s 'modified *McDonnell Douglas* approach' to retaliation claims.") (citing cases). Under a mixed-motive theory, a plaintiff must offer sufficient evidence to create a genuine issue of fact that the employer's reason for firing him, although true, "was but one of the reasons for its conduct, another of which was retaliation." *Akop v. Goody Goody Liquor, Inc.*, No. Civ.A.3:04CV2058-D, 2006 WL 119146, *10 (N.D. Tex. Jan. 17, 2006) (citing *Rachid*, 376 F.3d at 312).  Evidence that creates a triable issue over whether the employer's reasons for firing the plaintiff included the plaintiff's "protected characteristic" requires denying summary judgment and allowing the factfinder to resolve the dispute. *See Martin v. El Nell Inc.*, No. 3:03-CV-2209-D, 2005 WL 2148651, *4 (N.D. Tex. Sept. 7, 2005).

6

II.    **The Summary Judgment Evidence**

McCracken, who describes himself as a devout Christian, worked as an Exxon Mobil employee from 1967 to 1985, when he left to pursue other interests.  McCracken returned to work as contract employee at Exxon Mobil's Baytown Olefins Plant from 1987 to July 1989 and returned briefly to the same plant in October 1990.  In the late 1990s, McCracken worked at the Baytown plant through a staffing company, Allstates.  In 1999, Kelly Scientific Resources, Inc. took over the Allstates contract, at which point McCracken and the other former Allstates employees signed contracts with Kelly Services, Kelly Scientific Resources, Inc.'s parent company.  Throughout the relevant period, McCracken worked for Kelly Scientific, which placed him at Exxon Mobil.

At the Baytown plant, McCracken worked as a lab technician with five to fifteen other individuals.  The lab performed chemical tests on ethylene production, as directed by Exxon Mobil.  McCracken already knew the process and needed no additional training.  McCracken received favorable job performance reviews from 2001 to 2003.  (Docket Entry No. 26, Ex. 8).

In early 2000, McCracken became aware that several lab employees "adhered to certain spiritual, religious teachings and practices of an individual named Alix Rodwell and a 'new age' belief system, including a healing practice known as 'Reiki.'"  (Docket Entry No. 25 at 7).  According to advertisements that McCracken submitted as summary judgment evidence, Rodwell styles herself a life coach and spiritual advisor.  She offers services described as "Right Family Dynamics, Clearing Family Patterns, New Decision Therapy,

Past Life Sessions, Soul Retrieval, Entity Clearing, Reiki — Energy Work, [and] Psychic Readings."  (Docket Entry No. 26, Ex. 18 at 6).  The advertisements describe happy customers who believe that Rodwell has transformed their lives, removed evil spirits from their minds, and even cured illnesses such as hepatitis.  (Docket Entry No. 26, Ex. 16).

In May 2000, Lisa Macuba,[2] a Kelly Scientific contract employee also working in the lab, was diagnosed with cancer.  (Docket Entry No. 26, Ex. 17).  Macuba told Elaine Scharold, her supervisor, who was an Exxon Mobil employee.  Scharold told Macuba that "evil in her life" caused the cancer and recommended that Macuba make an appointment with Rodwell to remove the evil spirits.  According to McCracken, when Macuba hesitated, Scharold, along with lab workers Teacy Williams and Colleen DuRousseau, pressured her to go see Rodwell.  Macuba made an appointment with Rodwell, but cancelled it. McCracken asserts that after this incident, Scharold, who had had a positive working relationship with Macuba, became hostile.  Macuba told McCracken that she had overheard Scharold and Williams discussing Macuba's future employment in bleak terms and that Scharold had told Macuba that her job was in jeopardy.  (Id.).  McCracken complained to Shelly Wahl, a Kelly Scientific supervisor, about the treatment Macuba encountered.  Wahl interviewed some of the Kelly Scientific employees.  After those interviews, Scharold told Macuba that her job was likely to end in June as part of an efficiency plan within the lab because she did not have experience in certain lab techniques.  (Docket Entry No. 15 at

---

[2] The record also refers to Macuba's maiden name, Lisa Irwin.

EMWM 299; Docket Entry No. 26, Ex 15, EMWM00336).  Macuba told Scharold that she did have the necessary experience and showed her where it was listed on her resume. (Docket Entry No. 26, Ex. 17).  Scharold also claimed that Macuba had a record of tardiness and had failed to report for a particular assignment; Macuba explained that she had not received the call for the assignment.  (*Id.*).

Wahl notified Exxon Mobil of the complaint McCracken had made.  Exxon Mobil sent a team from human resources to investigate.  The team interviewed the lab employees, including Cindi Foster.  In 1999, Foster had been persuaded to visit Rodwell by Scharold and three other Exxon Mobil lab employees, Ida Pipkin, Coleen DuRousseau, and a contract employee, Teacy Williams, who paid for Foster's visit.  After Foster's day with Rodwell, she told her coworkers and supervisor that she did not want to return.  Foster told the Exxon Mobil investigators in July 2000 that she had felt no harassment as a result of her decision. (Docket Entry No. 26, Ex. 15 at EMWM 302).  McCracken was also interviewed during the investigation.  He told the interviewers that in 2000, Scharold had suggested that he visit Rodwell.  McCracken told Scharold that he was "not interested."  According to McCracken, "the topic was not discussed again with him."  (*Id.* at EMWM00263).  McCracken did not identify any adverse consequences directed at him after he declined the invitation to see Rodwell.

After the investigation, Exxon Mobil issued a report stating that Scharold had exhibited what could be perceived as an "inappropriate use of supervisory authority" in encouraging Macuba to visit Scharold's "personal advisor."  Exxon Mobil determined that

the conduct did not rise to the level of harassment.  Exxon Mobil counseled Scharold about her role as a supervisor, told her that she should refrain from conversations that might make workers under her supervision — like Macuba — uncomfortable, and that she should keep her personal and religious beliefs to herself.  (Docket Entry No. 26, Ex. 15).

Macuba did not lose her job in June 2002.  She resigned from the lab in November 2000.  In a statement she submitted to Exxon Mobil, Macuba explained that the decision was a result of health concerns; she was pregnant and no longer wanted to work in a chemical plant.  (Docket Entry No. 26, Ex. 15 at EMWM000299).

In May 2002, Cindi Foster, an Exxon Mobil employee working in the lab, was fired. In June 2002, McCracken complained to Kelly Scientific that Foster had been targeted for firing as a result of her 1999 refusal to engage Rodwell as a spiritual advisor.[3]  Foster subsequently filed an EEOC complaint and a lawsuit alleging that her firing resulted from religious discrimination.  In the EEOC complaint, Foster asserted that, after she had refused to return to Rodwell in 1999,[4] Scharold and DuRousseau harassed her, made her job difficult, subjected her work to a level of scrutiny that other employees did not receive, and singled her out for disparately harsh treatment when routine errors occurred.  Foster was fired for errors in her work.  She alleged that the case "was built against me by Elaine Scharold, Ida

---

[3]  Foster filed a discrimination suit as a result of this conduct.  (Docket Entry No. 26, Ex. 16).  This court remanded that case to state court.  *Foster v. Exxon Mobil*, No. 05-CV-776 (S.D. Tex. June 13, 2005) (unreported).

[4]  The complaint Foster filed with the Texas Commission on Human Rights indicates that the incident took place in 1997.  (Docket Entry No. 26, Ex. 16 at 1).  Later documents indicate that the correct date is 1999.

Pipkin, and Colleen DuRoussea because of an encounter with Elaine and Colleen.  They wanted me to allow Alix Rodwell to go out in my daughter's universe to give her hearing back.  I didn't want any part of it. . . . I feel if I had joined this cult I would have been part of this group and had been allowed to have special jobs and advantages and to this day would still be working for ExxonMobil."  (Docket Entry No. 26, Ex. 16).  Foster alleged that her denial of harassment by the protégés of Rodwell during the 2000 investigation into the complaint about Macuba was false, motivated by fear that her own job was at risk.  (*Id.*).

In May and June 2002, McCracken complained to Shelly Wahl about the firing of Cindi Foster.  In this lawsuit, McCracken asserted that Wahl took no action and refused his request to speak directly to Exxon Mobil's human relations department.  (Docket Entry No. 26, Ex. 1, McCracken Affidavit).  On June 26, 2002, McCracken sent a lengthy e-mail directly to Lee Raymond, Exxon Mobil's Chairman.  McCracken alleged that he was about to be "terminated because [he] reported an unethical situation that was going on in the . . . laboratory in June of 2000," which was "never taken care of" and had resulted in Foster's recent firing.  (Docket Entry No. 26, Ex. 19–20).  The body of the e-mail, which was approximately one and one-half printed pages, mentioned "unethical situations" at the lab and McCracken's fear that he will be fired.  McCracken stated that after he had sent an e-mail to Wahl and to the human relations manager at the Exxon Mobil plant, asking for a meeting with him, Wahl instructed him not to send more e-mails to that manager and instead scheduled a meeting with McCracken herself.  Attached to the transmittal e-mail was a lengthy document labeled "Trouble at work–Help Us Jesus!.doc."  (Docket Entry No. 26, Ex.

11

19).  In his deposition, McCracken acknowledged that he often used this expression at work. (Docket Entry No. 22, Ex. B at 87).

McCracken began the e-mail attachment by recounting various disagreements among employees at the lab without referring to any religious discrimination.  The first mention of any religion issue was with respect to the Macuba situation that had been investigated in 2000.  The attachment described the chronology of the events in 2000 involving Macuba and Exxon Mobil's investigation.  (*Id.*).  The attachment described the events leading up to Foster's firing.  McCracken stated that he knew that Scharold had allowed coworkers named Nick Daniels and Collen DuRousseau to discredit and harass Foster, resulting in her mistakes.  McCracken explained that although Foster had made an error on a lab test, she was forced to resign "because she wasn't an Alix Rodwell protégé and she had made Ida Pipkin [another employee] an enemy sometime in the '80's."  (*Id.*).  McCracken asserted his belief that he was about to be fired as well.

McCracken described problems in running tests and in calibrating instruments he had experienced after May 2002.  He claimed that his supervisors were attempting to eliminate a test he performed.  (*Id.* at 7).[5]  McCracken asked, "Who could they be trying to get rid of now?"  McCracken blamed these developments on his efforts to help Foster and Macuba and on his refusal to follow Rodwell:

---

[5] Although McCracken mentioned this incident twice in the same document, it appears to be a single conspiracy theory.

12

> When I protected Cindi Foster and Lisa Irwin I made enemies of people that have the power to manipulate circumstances that will ultimately affect others well being. . . . Teacy Williams [was] hired on January 1997[,] one day after I came back from being gone for nine months.  Why they are choosing to let me go isn't that Teacy Williams is a better employee than I am, but because I helped Cindi Foster in 1997 and Lisa Irwin in 2000. Teacy Williams is an Alix Rodwell protege.  They use a method to reach the spiritual realm called reiki.  You can find out more on reiki at www.reiki.org[.]  I have no argument with their right to practice reiki only with me being singled out because I don't. I also feel as if this is a situation that Kelly Scientific could have insisted on being resolved in 2000 and I wouldn't be having my problems in 2002.  I called by contract supervisor, Shelly Wahl sometime around May 20th and she suggested that I quit and find another job.  Not very supportive.

(*Id.* at 6–7).

McCracken also listed the numerous individuals he had contacted about his concerns. He called his Kelly Scientific supervisor, Shelly Wahl, who was out on vacation. McCracken called the emergency contact listed on Wahl's voicemail, which led him to an individual working in the Houston recruiting office.  He then spoke to Bill Lemmons, Shelly Wahl's boss, who asked him to send the same document to him.  Lemmons further explained to McCracken that he had forwarded the issue on to his HR department, which was "still trying to decipher" McCracken's complaint.  (*Id.* at 8).  Lemmons apparently sent the document to Shelly Wahl.  McCracken reported that Wahl called and wanted to set up a meeting with McCracken.  McCracken responded by "formally" requesting a meeting with Wahl and Charles Pryor, the HR manager at the plant, and sending the e-mail to Raymond. (*Id.*).

In response to the June 2002 e-mail McCracken sent to the Chairman, Exxon Mobil's human resources department notified Wahl, assembled a team, and conducted an investigation. The team concluded that the lab employees were not harassing McCracken. (Docket Entry No. 26, Ex. 20 at EMWM 401). Exxon Mobil did not contact McCracken directly to report the investigation results, but relied on Kelly Scientific to do so as part of ensuring that "any contractor personnel decision and action is handled within the contract organization, and outside of ExxonMobil's direct control." (*Id.* at EMWM 403). Wahl warned McCracken that employment disputes, including claims of harassment, should be presented to, and handled through, Kelly Scientific, not outside clients such as Exxon Mobil. (Docket Entry No. 26, Ex. 3 at 77–80; Ex. 4). McCracken does not dispute that he was told orally and in writing that he should report future concerns about the workplace to Kelly Scientific. (Docket Entry Nos. 22, Ex. B at 86; 26, Ex. 4).

McCracken continued to work at the lab. In July 2002, Kelly Scientific sent McCracken his performance rating for 2001-2002. He had received positive reviews from Scharold, was given an overall rating of "very good," and received a 5.67% pay raise, from $23.15 per hour to $24.50 per hour. (Docket Entry No. 20, Ex. 8).

On January 7, 2003, despite the warning Wahl had given him not to make complaints directly to Exxon Mobil, McCracken sent another e-mail to Raymond, the Chairman. (Docket Entry No. 42, Ex. CC-1). McCracken referred to attachments explaining the Cindi Foster case, which he described as involving a "22 year Exxon employee that was terminated in May of 2002 [who] . . . had a case built against her by . . . Colleen DuRousseau, Ida

14

Pipkin, and Elaine Scharold."  McCracken explained that DuRousseau was attempting to "build a case" against him by manipulating lab tests to make it look as if he was "not able to do my job."  (*Id.* at EMWM 396).  McCracken explained that he had been accused of making several errors on tests, which he argued resulted from DuRousseau's manipulation of the tests.  (*Id.* at EMWM 397).  The final paragraph of the e-mail summarized McCracken's allegations:

> They are once again trying to cut out work — mainly silicas and phosphates — to get rid of somebody.  They are now going to have to make a decision to let me or another alix [sic] rodwell [sic] protégé — Teacy Williams go.  Colleen DuRousseau — another alix [sic] rodwell [sic] protégé — is trying to make sure it is me. . . .  As you will find as you read the attached document this group of employees that have chosen to make alix [sic] rodwell [sic] their spiritual leader have been allowed to continue to manipulate circumstances and harass employees since I first reported it in 2000 when they tried to get Lisa Irwin fired.  I once again apologize for having to send another letter, but the HR department at the Baytown Olefins Plant has never been helpful and my company, Kelly Scientific Resources, doesn't get paid to make me happy.

(*Id.* at EMWM 397).

The human resources manager at Exxon Mobil's Baytown Olefins Plant, Tom Marcotte, and Wahl, McCracken's supervisor at Kelly Scientific, met the following day, January 8, 2003, to discuss McCracken's e-mail.  The second-line supervisor for the Lab/Analyzer Section of the lab, E. D. Calloway, and Wahl confirmed that McCracken had not filed an official complaint or reported the lab issues he described in the e-mail to either Exxon Mobil's human resources department or Kelly Scientific.

Exxon Mobil launched an investigation into McCracken's allegations.  Exxon Mobil contacted "BTRF PeakPro systems experts" to learn whether it was possible to identify the lab tests that McCracken had described in his e-mail. From the PeakPro data and the report of an expert on the testing system, Exxon Mobil learned that "no one can manipulate or change method/sample data in PeakPro without a date/time stamp."  Exxon Mobil concluded that the data "clearly refutes Mr. McCracken's allegations" that DuRousseau had manipulated the test to make McCracken's results incorrect.  Instead, McCracken had performed the tests incorrectly.  The investigation concluded:

> Based on the audit reports from the PeakPro system, and discussions with the system expert, . . .Mr. McCracken ran the requested sample on the incorrect method (900) instead of the method requested (901) five separate times.  The allegation that Ms. Durousseau altered the integrity of the data and changed the run times while Mr. McCracken had his back turned is not possible within the parameters and audit controls of the current PeakPro system.  Any data changes made in Peak Pro system will produce a time and date stamp, and the investigation records indicate that no changes have been made to these methods since August of 2002.  Ms. Durousseau. . . confirmed that Mr. McCracken had not confronted her about any issues relating to job sample runs on January 2, 2003.

(*Id.*).  Exxon Mobile concluded that there was no evidence of harassment because  there was no manipulation of lab tests and McCracken had not filed complaints either with Kelly Scientific or Exxon Mobil from June 2002 to  the January 7, 2003 e-mail sent to the Chairman.  (*Id.*).

On January 14, 2003, Marcotte and Calloway from Exxon Mobil met with Wahl from Kelly Scientific.  Notes from the discussion show that Exxon Mobil expressed its frustration

that McCracken had again raised a complaint "outside his internal chain of command." (Docket Entry No. 25, Ex. 4). Exxon Mobil characterized McCracken's e-mail as containing allegations of "unethical behavior and/or practices in the" lab, rather than as a complaint of religious discrimination. (*Id.*). "The bottom line is that we cannot have this continued behavior from Mr. McCracken and the disruption to our lab business." (*Id.*). The discussion notes stated that both Exxon Mobil staff and Kelly Scientific attempted to resolve "the first complaint through the proper channels, and this is the second incident involving unfounded allegations." (*Id.*) The notes indicated that "[b]ased on the data presented, Kelly Services is prepared to remove Mr. McCracken from the site, and to progress immediate internal Kelly Scientific corrective personnel actions." (*Id.*). At the meeting, Shelly Wahl stated that Kelly Services's "corporate HR group has already issued [McCracken] a memorandum stating the need to resolve personnel issues / concerns through the internal Kelly Scientific channels." (*Id.*). After the meeting, Kelly Scientific fired McCracken. (Docket Entry No. 26, Exs. 4, 7).

After exhausting administrative remedies on his claims of religious discrimination and retaliation, McCracken filed this lawsuit. The motions for summary judgment followed discovery. McCracken has stipulated to the dismissal of a hostile work environment claim. Defendants have moved for summary judgment as to the religious discrimination and retaliation claims.

## III.    Analysis

### A.    Whether Exxon Mobil Was McCracken's "Employer" for Title VII Purposes

Exxon Mobil's first basis for summary judgment is that Kelly Scientific, not Exxon Mobil, was his "employer" for Title VII purposes.  To determine whether an entity is an "employer" under Title VII, Fifth Circuit courts apply the "hybrid economic realities/common law control test."  *Deal v. State Farm County Mut. Ins. Co. of Tex.*, 5 F.3d 117, 118–19 (5th Cir. 1993).  The "control component" of this test examines whether the alleged employer has the right: (1) to hire and fire the employee; (2) to supervise the employee; and (3) to set the employee's work schedule. *Id.* at 119.  The "economic realities" component of the test focuses on whether the alleged employer:  (1) paid the employee's salary; (2) withheld appropriate taxes; (3) provided benefits; and (4) set the terms and conditions of employment.  *Id.*  Between the two components, the right to control the employee's conduct is the most important.  *Id.*; *accord EEOC v. Fawn Vendors, Inc.*, 965 F. Supp. 909, 913 (S.D. Tex. 1996) ("[T]he economic factors in this case are outweighed by the extent of [the employer]'s right to control [the employee]'s work.").

Summary judgment evidence submitted by Exxon Mobil confirms that when he was fired, McCracken understood that Kelly Scientific was his employer.  McCracken had signed a contract with Kelly Scientific that included a stipulation that he was not an Exxon Mobil employee, but instead worked as an independent contractor through Kelly Scientific.  Kelly Scientific paid McCracken's salary, benefits, and withheld the appropriate taxes from his paycheck.  (Docket Entry No. 22, Ex. B at 15–19; Ex. C ¶ 13; Ex. D at 13; Ex. E).  Kelly

18

Scientific had the exclusive right to hire and fire McCracken, supervise him, and set his work schedule.

McCracken does not specifically dispute this evidence, but argues that Exxon Mobil as well as Kelly Scientific supervised his work and employed him. McCracken worked in an Exxon Mobil lab surrounded by Exxon Mobil employees. The Kelly Scientific "supervisor" to whom McCracken answered worked approximately two miles away from the Exxon Mobil lab and saw him only once every few months. (Docket Entry No. 26, Ex. 2 at 6, 8–9). According to McCracken, Exxon Mobil provided his training, day-to-day supervision, and set his work schedule. Although Kelly Scientific paid McCracken's salary and benefits, Exxon Mobil fully reimbursed Kelly Scientific. (Docket Entry No. 26, Ex. 2 at 16; Exs. 9, 10). Exxon Mobil evaluated McCracken's job performance, sent him memoranda, approved the salary (and raises) he received, and conducted the investigation that led to Kelly Scientific's decision to fire McCracken. (Docket Entry No. 26, Ex. 2 at 9; Ex. 8). Additionally, Exxon Mobil dictated the job functions performed by the workers in the lab, selected the supervisors, and required every worker to comply with Exxon Mobil's policies. (Docket Entry No. 26, Ex. 2 at 125–26).

Exxon Mobil relies heavily on an unpublished case with similar facts from the Northern District of Texas. In *Mayes v. Kelly Services, Inc.*, 2004 WL 533951 (N.D. Tex. Feb. 11, 2004), the court held that Kelly Services, not Onstar, was the plaintiff's employer for Title VII purposes. As in this case, the summary judgment record in *Mayes* included evidence that Kelly Services, not Onstar, provided the plaintiff's salary, withheld taxes,

provided benefits, and set the terms and conditions of employment.  *Id.* at *3.  The contract between Onstar and Kelly Services, also part of the record, required Kelly Services to supply Onstar with employees for assignment and to train those employees for the services to be provided.  *Id.*  "When plaintiff's assignment with Onstar ended, he still had an opportunity to request Kelly to assign him to a different workplace."  *Id.*

McCracken has introduced stronger summary judgment evidence of control by Exxon Mobil than the *Mayes* plaintiff presented.  Although Kelly Scientific hired, fired, and paid McCracken, and had the right to supervise him and set his hours, Exxon Mobil had the right to — and did — train, supervise, and set the schedule for McCracken.  Fact issues remain as to whether Exxon Mobil could be considered McCracken's employer for Title VII purposes.  *Cf. Edwards v. Galveston-Tex. City Pilots*, 203 F. Supp. 2d 759, 762 n.1 (S.D. Tex. 2002) (rejecting a claim by defendants that the plaintiff was an independent contractor, not an employee, because the "Plaintiff produce[d] at least some evidence showing that Defendants control[led] the [Plaintiff's] daily work functions, which is the most crucial factor in assessing the existence of an employment relationship.").

Exxon Mobil also argues that it played no role in the decision to fire McCracken.  (Docket Entry No. 22 at 11).  The record does not support this claim.  Kelly Scientific fired McCracken after Exxon Mobil officials complained following McCracken's e-mail to Raymond.  (Docket Entry No. 26, Ex. 4).  McCracken has created a genuine issue of fact material to determining Exxon Mobil's role in the decision to fire McCracken.

B.    **The Religious Discrimination Claim**

1.    *The Claim of Discharge Based on Religious Discrimination*

The parties do not dispute that McCracken belonged to a protected class, had the appropriate qualifications for his job, and suffered an adverse employment action (job termination).  Defendants assert a legitimate nondiscriminatory reasons for the decision to fire McCracken: he complained about problems he encountered in the workplace to the Chairman of Exxon Mobil despite a policy of making complaints to Kelly Scientific, not to its customer, Exxon Mobil.

McCracken denies that he violated such a policy on the ground that no such policy existed.  He points to deposition testimony from Wahl that no policy prohibited McCracken from complaining about discrimination at Exxon Mobil to Exxon Mobil.  (Docket Entry No. 42, Ex. AA at 23, 26, 49).  McCracken also cites Exxon Mobil's own policy, which required contract workers as well as employees to report incidents of discrimination.  (Docket Entry No. 23, Ex. 14).  Wahl verified this view of the policy.  (Docket Entry No. 42, Ex. AA at 26–27).

Kelly Scientific contractors working at Exxon Mobil were subject to Exxon Mobil's harassment policy, which encouraged employees to report violations of Title VII.  (Docket Entry No. 23, Ex. 14).  Kelly Scientific used a similar policy.  Both policies established numerous channels through which an employee could report observed harassment.  Exxon Mobil's policy instructed any employee who witnessed "any incident of harassment . . . immediately [to] report the incident to your supervisor or management representative of your

21

employer and to the Exxon representative for whom you are performing services as appropriate." (*Id.* at KS 391). Another publication describing the Exxon Mobil policy reads, "Any employee or supervisor who observes or becomes aware of harassment should immediately advise their supervisor, higher management or their designated Human Resources contact. . . .  All complaints or concerns should be brought to management's or Human Resources' attention so that steps can be taken to correct them."  (*Id.* at EMWM 604).  Wahl was McCracken's supervisor and the next level of management was Bill Lemmons.  Nothing in the policy suggests that a contract employee such as McCracken should contact the Chairman of the customer, Exxon Mobil.  Wahl testified that after the first e-mail, she told McCracken verbally and in writing not to send another similar communication and clarified the policy.  (Docket Entry No. 42, Ex. AA at 32).  To the extent McCracken interpreted "higher management" to include the CEO, Kelly Scientific clarified the appropriate chain of command after he sent his first e-mail to Raymond.  McCracken does not dispute that he received this counseling.

McCracken disputes that there was a rule in place explicitly stating that he could not raise a workplace complaint directly with Exxon Mobil when he sent the first e-mail to the Chairman in June 2002.  McCracken does not dispute, however, that in July 2002, after he sent the first e-mail to Raymond, he was specifically instructed to take complaints about the workplace to Kelly Scientific, not to Exxon Mobil.  (Docket Entry No. 22, Ex. B at 86 ("Q: You were told that if you did it again, you would suffer disciplinary actions up to and including termination; is that correct? A: Right.")).  McCracken does not dispute that in

January 2003, he sent a second e-mail to Chairman Raymond.  The evidence is undisputed that when McCracken sent the second e-mail, he had not raised the subject of the complaint — allegedly manipulated lab tests conducted on January 2, 2003 — with Kelly Scientific or with Exxon Mobil.  Indeed, the last record of any complaint from McCracken was in June 2002.  It is undisputed that when McCracken sent the second e-mail in January 2003, he violated the instructions that he had explicitly received in June 2002.  The evidence is undisputed that McCracken violated a work rule when he sent the second e-mail.

The summary judgment evidence does not show any other Kelly Scientific or Exxon Mobil employee who was fired after complaining about workplace conditions by communicating directly with the Exxon Mobil Chairman.  There is no evidence that any other employee engaged in similar conduct.[6]  McCracken has admitted violating the oral and written warning to complain to Kelly Scientific, not to Exxon Mobil.  McCracken has not raised a fact issue as to whether the decision to fire him for that violation was discriminatorily and disparately harsh.  There is no showing that Rodwell Group members were treated differently under circumstances "nearly identical" to McCracken's.  *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 345 (5th Cir. 2005) (quoting *Mayberry*, 55 F.3d at 1090) (additional citations omitted in original)); *Wheeler v. BL Development Corp.*, 415 F.3d 399, 406 (5th Cir. 2005).  And McCracken has not alleged, and the record does not show,

---

[6]  McCracken does not allege, and the evidence does not show, that he was fired because he performed his job poorly.  To the contrary, McCracken received good reviews and in 2002 had received a 5% raise.  (Docket Entry No. 26, Ex. 8).

that anyone involved in the decision to fire him was part of the "Rodwell Group" or exhibited any animosity whatsoever toward McCracken on the basis of his religion.[7]

McCracken has failed to raise a fact issue as to whether the decision to fire him resulted from religious discrimination.

> ### 2. The Claim of Discrimination in the Terms and Conditions of Employment

McCracken has dismissed his religiously-based hostile work environment claim but alleges that the "Rodwell Group," including his supervisor, Elaine Scharold, singled him out for disparate treatment because he was a Christian and refused to consult with Rodwell. Although McCracken alleged that others, such as Macuba and Foster, were respectively pressured to resign and fired when they refused to join the Rodwell Group, the allegations and evidence as to the treatment he received after when he declined to see Rodwell are less specific.  McCracken stated in his declaration that he was subjected to "negative treatment" by members of the Rodwell Group.  (Docket Entry Nos. 26, Ex. 1; 42, Ex. CC, ¶ 10).  In his e-mails, McCracken asserted that in May 2002, after Foster was fired and after Macuba resigned, DuRousseau made a statement designed to make him angry; that he defeated an attempt to cheat on a coin toss to decide who would work on a different shift and won the right to stay on his shift; that Ida Pipkin came in to do an observation "to get [McCracken]

---

[7] McCracken has argued that there is a fact issue as to pretext because in January 2003, Exxon Mobil also complained to Kelly Scientific that he repeatedly made "unfounded" accusations that were disruptive. On this record, however, even if McCracken made a prima facie showing and raised an issue as to whether the proffered reason for firing McCracken was the only reason, no rational factfinder could conclude that the action was the result of religious discrimination.

to say something to her about Cindi being fired"; that a complaint about an instrument calibration was brushed off; and that "they" were going to try to cut out a test that he had responsibility over.  (Docket Entry No. 26, Ex. 20).  In January 2003, McCracken alleged that "while he had [his] back . . . turned," DuRousseau changed the run time in order to make the test erroneous.  None of these allegations describe "adverse employment actions" that are cognizable in Title VII discrimination claims.  *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) (noting, in a sexual harassment case, that "a tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."); *Pegram v. Honeywell*, 361 F.3d 272, 283 (5th Cir. 2004) ("Circuit precedent establishes that in cases where the evidence produces no objective showing of a loss in compensation, duties, or benefits, but rather solely establishes that a plaintiff was transferred from a prestigious and desirable position to another position, that evidence is insufficient to establish an adverse employment action." (citing *Serna v. City of San Antonio*, 244 F.3d 479, 485 (5th Cir. 2001)).  There is no basis on this record to conclude that the incidents and conduct McCracken alleges he experienced after he declined to visit Rodwell detrimentally affected his employment status, compensation, benefits, or responsibilities.  As McCracken himself notes, Scharold continued to give McCracken positive work reviews through 2002.  (Docket Entry No. 26, Ex. 8).  The incidents and conduct McCracken alleged — other than the decision to fire him — were not adverse employment actions covered by Title VII.

25

This court concludes that, taking the summary judgment evidence in the light most favorable to McCracken, he has failed to raise a fact issue as to whether he was fired or otherwise discriminated against based on his religion.  Defendants' motion for summary judgment on this basis is granted.

## C.    The Retaliation Claim

McCracken alleges that Exxon Mobil and Kelly Scientific "retaliated against [him] for voicing concerns about religious discrimination against himself and others."  (Docket Entry No. 1 ¶ 30).  Exxon Mobil and Kelly Scientific have now both asserted that they are entitled to summary judgment on this claim.   Both have identified a legitimate nondiscriminatory reason for the decision to fire McCracken: his failure to follow instructions as to the way he complained, specifically by sending e-mail to Exxon Mobil's CEO alleging a conspiracy of unethical behavior by his coworkers and supervisor.  (*See, e.g.*, Docket Entry No. 23, Ex. 5 at 2 ("McCracken was terminated for insubordination in his repeated failure to follow his employer's policy regarding the reporting of perceived improper conduct at the work site."), Ex. 6 at 4 (responding in an interrogatory that Kelly Scientific fired McCracken for "repeatedly contacting Kelly's customer, Exxon Mobil[,] about work place issues in direct violation of Kelly's policy that employee issues or complaints are to be handled internally")).

The reason defendants proffer is not only a basis for challenging causation or shifting the burden under *McDonnell Douglas*, it also challenges McCracken's *prima facie* case requirement that the complaint he made was protected conduct under Title VII.  The Fifth

Circuit has recognized that "some conduct, even though engaged in with the most sincere of intentions, may be so inappropriate as to justify the curtailment of statutorily-afforded safeguards." *Jones v. Flagship Int'l*, 793 F.2d 714, 727 (5th Cir. 1986) (holding that plaintiff's decision to use personnel files, organize a class action lawsuit, and encourage other employees to file similar discrimination suits and join the class action against former employer while on the job were not protected).  "[T]he employer's right to run his business must be balanced against the rights of the employee to express his grievances and promote his own welfare . . . The yardstick against which the employee's conduct must be measured is the flexible and protean doctrine of 'reasonableness in [the] light of the circumstances.'" *Douglas v. DynmCDermott Petroleum Operations Co.*, 144 F.3d 364, 374 (5th Cir. 1998). Courts look to whether the protest of an employment practice so interferes with the performance of plaintiff's job or with the right of the employer to run its business as to make the form of opposition to the practice unprotected.  *Id.*; *see also Rosser*, 616 F.2d at 224 (holding that plaintiff who sought her boss's job through union elections did not engage in protected activity); *Jeffries v. Harris County Cmty. Action Ass'n*, 615 F.2d 1025, 1036 (5th Cir. 1980) (holding that plaintiff's dissemination of confidential employment records calling attention to her belief that she was a victim of discrimination was clearly unreasonable). Defendants have not, however, specifically moved for summary judgment on the ground that by sending the e-mails to the Chairman of its customer, Exxon Mobil, McCracken interfered with Kelly Scientific's right to run its business.

27

Defendants do challenge causation and assert that they had a legitimate nonretaliatory reason for firing McCracken. (Docket Entry Nos. 27 at 6–7, 38 at 11, 43 at 2–3). Kelly Scientific stated that it fired McCracken for contacting Exxon Mobil directly with his complaint. Exxon Mobil stated that it discussed this problem with Kelly Scientific and also raised the concern that McCracken's reports were considered a "disruption." McCracken points to an Exxon Mobil memorandum in which Exxon Mobil officials complained to Kelly Scientific that "we cannot have this continued behavior from Mr. McCracken and the disruption to our lab business" and that both Exxon Mobil and Kelly Scientific "tried to resolve the first complaint through the proper channels — this is the second incident involving unfounded allegations." (Docket Entry No. 26, Ex. 4). McCracken has made a *prima facie* showing that defendants fired McCracken because of his complaints.

The evidence shows that in June 2002, McCracken was specifically warned that if he again complained directly to the Chairman of Exxon Mobil, he would be fired. (Docket Entry No. 22, Ex. B at 86). It is undisputed that McCracken violated this work rule. The record also shows that Exxon Mobil wanted McCracken's "unfounded" complaints stopped. In his deposition, Tom Marcotte, Exxon Mobil's human resources manager at the Baytown plant, explained that he meant that McCracken's complaints were "unsubstantiated" and "inconclusive." (Docket Entry No. 42, Ex. BB at 60–63). Under either the *McDonnell Douglas* or mixed-motive approaches, a fact issue exists as to whether McCracken was fired because of the substance of his complaints as opposed to the way in which he made those complaints.

28

McCracken asserts that an employee cannot be fired for complaining about discrimination, even if the complaint turns out to be "unfounded." *See, e.g.*, *Cartagena v. Aegis Mortgage Corp, Inc.*, 275 F.3d 46 (5th Cir. 2001) (noting that a complaint is "'protected activity' . . . if he 'had at least a 'reasonable belief' that the practices [he] opposed were unlawful [under Title VII]" (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 309 (5th Cir. 1996) (alterations in original)).  However, an employee can be fired or otherwise disciplined for complaining about discrimination if the complaint lacks a reasonable basis. The Fifth Circuit, with others, has made it clear that a retaliation claim requires "at least a reasonable belief" that the practices the plaintiff opposed or complained about were unlawful. *See id.*; *Mota v. Univ. of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001); *see also Bd. of County Comm'rs, Fremont County, Colo. v. EEOC*, 405 F.3d 840, 852 (10th Cir. 2005) ("Thus, the issue is not [the plaintiff's] subjective reasons for filing his original complaint of 'third-party sexual harassment' with the EEOC, but rather, whether he had a good faith belief that the conduct complained of violated Title VII."); *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1312 (11th Cir. 2002) ("A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the fact and record presented.") (quoting *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997) (emphasis in original)).

In this case, the record shows that although McCracken "stood up for" Macuba in 2000 and for Foster in 1997 and again in 2002, he was not fired until January 2003, after

sending a second complaining e-mail to the Exxon Mobil Chairman.  In this second complaining e-mail, McCracken alleged that a member of the Rodwell Group had deliberately changed the test parameters so that McCracken would incorrectly conduct the test.  The investigation revealed that no such change could have been made and that McCracken had repeatedly performed the test incorrectly.  Defendants have not raised the issue of whether McCracken had an objectively reasonable basis to accuse the lab workers of conspiring to have him fired by deliberately sabotaging his lab tests.  Because the parties did not explore this issue, this court does not rule on whether, as a matter of law, McCracken's January 2003 or earlier complaints were protected conduct under Title VII. Instead this court finds the motions and briefs inadequate to grant the motion for summary judgment on the retaliation claim.

Defendants' motion for summary judgment on McCracken's retaliation claim is denied.

### E.    The Hostile Work Environment Claim

Exxon Mobil argues that McCracken failed to exhaust available administrative remedies as to his hostile work environment claim.  A federal court lacks jurisdiction to hear a hostile work environment claim if the plaintiff fails to exhaust administrative remedies. *Barnes v. Levitt*, 118 F.3d 404, 408 (5th Cir. 1997).  McCracken concedes that he failed to exhaust his administrative remedies and that Exxon Mobil's motion should be granted on his hostile work environment claim.  (Docket Entry No. 25 at 22).  McCracken's hostile work environment claim against Exxon Mobil is dismissed for lack of jurisdiction.

**IV.    Conclusion and Order**

McCracken's motion to supplement the record is granted.  McCracken's motion for reconsideration is granted in part and denied in part.  This court withdraws its earlier Memorandum and Opinion and substitutes the present Memorandum and Order.  Kelly Scientific's motion for leave to file a motion for summary judgment is granted.  Defendants' motions for summary judgment are granted in part and denied in part.

Docket call is rescheduled for **March 31, 2006 at 2:00 p.m.**  The joint pretrial order is due by **March 24, 2006**.  A trial date will be set at docket call.

SIGNED on February 23, 2006, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge